UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

LUDWIG CRISS ZELAYA ROMERO,
MARIO GUILLERMO MEJIA VARGAS,
JUAN MANUEL AVILA MEZA,
CARLOS JOSE ZAVALA VELASQUEZ,
VICTOR OSWALDO LOPEZ FLORES, and
JORGE ALFREDO CRUZ CHAVEZ,

                                   Defendants.

S1 15 Cr. 174 (LGS)


**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS'
DISCOVERY MOTIONS AND
MOTION TO COMPEL RECIPROCAL DISCOVERY**

PREET BHARARA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States
of America*

Emil J. Bove III,
Mathew J. Laroche,
*Assistant United States Attorneys
    Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 3

   I. Honduras: A Major Transshipment Point for U.S.-Bound Cocaine Plagued by Violence ..... 3

   II. The Defendants:  Corrupt Members of the *Pólicia National de Honduras* ......................... 5

      A. The Drug-Trafficking Organization ................................................................. 5

      B. The 2009 Arrest of Mejia Vargas .................................................................... 6

      C. Murders and Machinegun Possession Involving Zelaya-Romero ...................... 6

      D. The DEA's Investigation ................................................................................. 7

   III. The Honduran Special Commission Investigating the Honduran National Police .............. 9

   IV. Procedural History ................................................................................................. 9

   V. Discovery Produced by the Government ............................................................... 11

ARGUMENT ................................................................................................................. 12

   I. The Defendants Are Not Entitled to Bills of Particulars ........................................ 12

      A. The Defendants' Requests ............................................................................. 12

      B. Applicable Law ............................................................................................. 13

      C. Discussion .................................................................................................... 15

   II. The Defendants' Request for *Brady* Material Is Moot and the Request for
Early Production of Jencks Act and *Giglio* Material Should Be Denied ................................ 23

      A. The Government Is in Compliance With Its *Brady* Obligations ...................... 23

      B. The Defendants Are Not Entitled to Additional Early Disclosures Regarding
Government Witnesses ................................................................................................. 25

         1. Applicable Law ........................................................................................ 25

         2. Discussion ................................................................................................ 28

   III. The Defendants Should Be Ordered to Provide Reciprocal Discovery Forthwith ............. 30

CONCLUSION ................................................................................................................. 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

LUDWIG CRISS ZELAYA ROMERO,
MARIO GUILLERMO MEJIA VARGAS,
JUAN MANUEL AVILA MEZA,
CARLOS JOSE ZAVALA VELASQUEZ,
VICTOR OSWALDO LOPEZ FLORES, and
JORGE ALFREDO CRUZ CHAVEZ,

                              Defendants.

S1 15 Cr. 174 (LGS)

The Government respectfully submits this memorandum of law: (i) in opposition to the motions for bills of particulars and production of materials subject to the Jencks Act, *Giglio*, and *Brady* filed by defendants Victor Oswaldo Lopez Flores (the "Lopez Flores Mem." (dkt. no. 94)), Carlos Jose Zavala Velasquez (the "Zavala Velasquez Mem." (dkt. no. 95)), and Juan Manuel Avila Meza (the "Avila Meza Mot." (dkt. no. 96) and "Avila Meza Mem." (dkt. no. 97)), which are joined by defendant Mario Guillermo Mejia Vargas; and (ii) in support of the Government's motion to compel the production of reciprocal discovery.

The defendants are members of the *Pólicia National de Honduras* (Honduran National Police) charged with participating in a conspiracy to import cocaine into the United States and related weapons offenses. The Government is aware of its obligations under Rule 16, *Brady*, and *Giglio*, is currently in compliance with those obligations, and will remain in compliance with those obligations in the future. The Indictment describes the Government's theory of this case, and the discovery—which has already exceeded the requirements of Rule 16—amplifies the bases for that theory by providing narrative descriptions of the evidence and summaries of certain

anticipated witness testimony.

As a result of the Government's extensive pretrial disclosures, the defendants cannot reasonably claim to be at risk of the type of unfair surprise that bills of particulars are intended to address. To the contrary, the defendants' submissions demonstrate that the materials produced by the Government have already facilitated an extensive defense investigation that led to the identification of two individuals who acted as confidential sources in this case (Jose Santos-Pena and Jose Santos-Hernandez), as well as 10 other potential witnesses (whom Avila Meza identified by name in his papers). And in an effort to address concerns raised by the defense relating to Santos-Pena and Santos-Hernandez, the Government recently provided transcripts of their testimony from another recent case in this District, which reflect extensive cross-examination and discussion of impeachment material relating to these potential witnesses.

In light of this record, the defendants' motions are transparent attempts to obtain an improper and unduly detailed preview of the Government's case-in-chief at an as-of-yet unscheduled trial through requests for discovery to which they are not entitled, premature identification of additional Government witnesses, and early production of witness statements. These requests are meritless on their face. Moreover, issues of safety and ongoing investigations, as described in the January 13, 2017 *Ex Parte* Declaration of Emil J. Bove III (the "*Ex Parte* Bove Declaration"), weigh strongly against requiring the disclosures the defendants seek. For all of these reasons, the defendants' motions should be denied. Finally, because the Government is in compliance with its Rule 16 obligations, the defendants should be required to produce forthwith all material subject to Rule 16(b)(1)(A)-(B).

**<u>BACKGROUND</u>**

The defendants are charged with participating in a cocaine-importation conspiracy and related weapons offenses relating to their agreement to support the violent criminal activities of multiple Honduran drug traffickers and their associates by providing security and sensitive law enforcement information to facilitate the transportation of large quantities of cocaine. Each of the defendants was caught on tape, with co-defendant Fabio Porfirio Lobo, agreeing to assist in the transportation of a multi-ton load of cocaine.

**I. Honduras: A Major Transshipment Point for U.S.-Bound Cocaine Plagued by Violence**

Honduras is one of the principal transshipment points in the world for cocaine that is produced in South America and imported into the United States.[1] Beginning in at least 2004, multiple drug-trafficking organizations operating in Honduras and elsewhere worked in concert with politicians, law enforcement officials, and military personnel to receive multi-hundred-kilogram loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.

---

[1]*E.g.*, United Nations Office on Drugs and Crime, *World Drug Report 2016* at 37-38 (2016), http://www.unodc.org/doc/wdr2016/WORLD_DRUG_REPORT_2016_web.pdf; *see also* Steven Dudley, *How Drug Trafficking Operates, Corrupts in Central America*, InSight Crime (July 6, 2016), http://www.insightcrime.org/news-analysis/how-drug-trafficking-operates-corrupts-in-central-america ("Central America has long been a bridge that connects the producer countries in South America to the consumer nations in the north, principally the United States.").

Drug traffickers paid bribes—sometimes styled as "campaign contributions"—to Honduran politicians holding and/or running for office, on the understanding that the politicians would support trafficker-friendly policies regarding matters such as investigative priorities and extradition policy. For further protection from official interference, and in order to facilitate the safe passage through Honduras of these massive loads of cocaine, drug traffickers also paid bribes to public officials—including certain members of the Honduran National Police—for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions.[2] These extensive drug-trafficking networks contributed to Honduras becoming one of the most violent places in the world.[3]

---

[2] *See, e.g.*, U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 17 ("Government institutions were subject to corruption and political influence, and some officials engaged in corrupt practices with impunity."), *available at* http://www.state.gov/documents/organization/236910.pdf.

[3] *See* U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 1 ("Pervasive societal violence persisted. Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders."); *see also* "SOUTHCOM chief: Central America drug war a dire threat to U.S. national security," *Military Times* (July 2014) ("By U.N. statistics, Honduras is the most violent nation on the planet with a rate of 90 murders per 100,000 citizens. . . . These figures become more shocking when compared to those of declared combat zones such as Afghanistan or the Democratic Republic of the Congo (28 in 2012). Profits earned via the illicit drug trade have corrupted and destroyed public institutions . . . , and facilitated a culture of impunity – regardless of crime – that delegitimizes the state and erodes its sovereignty, not to mention what it does to human rights.").

## II. The Defendants:  Corrupt Members of the *Pólicia National de Honduras*

### A. The Drug-Trafficking Organization

This case arose out of information and assistance provided to the Drug Enforcement Administration ("DEA") by a former Honduran drug trafficker who is now a cooperating witness ("CW-1").  Between approximately 2004 and approximately 2013, CW-1 and other members of his drug-trafficking organization (the "Drug-Trafficking Organization") specialized in transporting large loads of cocaine received in eastern Honduras to San Pedro Sula, Honduras, or points closer to the Honduras-Guatemala border.  Members of the Drug-Trafficking Organization typically used large trucks to carry the cocaine escorted by multiple security vehicles, some of which included members of the Honduran National Police.  Typically, at least some of the drug-trafficking personnel assigned to this security function carried machineguns.

In approximately 2004, CW-1 was introduced to defendant Ludwig Criss Zelaya Romero.  Zelaya Romero introduced CW-1 and other members of the Drug-Trafficking Organization to defendant Mario Guillermo Mejia Vargas.  Between approximately 2005 and at least approximately 2011, CW-1 frequently notified either Mejia Vargas or Zelaya Romero when the Drug-Trafficking Organization was to receive a load of cocaine in Honduras (often on a monthly basis).  Zelaya Romero and Mejia Vargas coordinated with other police officials to provide armed escorts for drug-laden vehicles, and to bypass, or remove, law-enforcement checkpoints and other roadblocks over predetermined routes as members of the Drug-Trafficking Organization transported the cocaine.  CW-1 typically paid the group of police between $70,000 and $100,000 per load of cocaine.

5

**B. The 2009 Arrest of Mejia Vargas**

On or about July 10, 2009, Honduran law enforcement authorities arrested Mejia Vargas and nine additional members of the Honduran National Police in the vicinity of Cruta, Honduras, in connection with the seizure of one kilogram of cocaine, more than 10 pistols, 10 semi-automatic rifles, and large amounts of ammunition. The following day, based on information from certain of the arrestees, Honduran law enforcement authorities arrested a co-conspirator at a location between Cruta and Kauquira, Honduras, and seized approximately 143 kilograms of cocaine that the co-conspirator was guarding.[4]

**C. Murders and Machinegun Possession Involving Zelaya-Romero**

Zelaya-Romero engaged in several acts of violence and related possession of weapons in furtherance of the Drug-Trafficking Organization's activities. For example, in approximately 2011, Zelaya-Romero participated in a conspiracy to murder a man known as "El Sapo," an associate of a Honduran gang named "Los Grillos," which resulted in approximately six murders. Acting at the direction of CW-1, Zelaya Romero participated in surveillance in the vicinity of Ramón Villeda Morales International Airport in San Pedro Sula, and identified a convoy of cars believed to be used by "El Sapo" so that the occupants of the vehicles could be targeted.

---

[4] The Government is currently unaware of the disposition of any charges against Mejia Vargas arising from this incident. The Government's August 8, 2016 request for legal assistance to the Government of Honduras (the "MLAT Request"), which has been provided to the defendants, seeks that information and discloses the names of the other individuals who were arrested with Mejia Vargas. (*See* Dkt. No. 95-2 at 3). These arrestees are distinct from the 12 potential witnesses identified in Avila Meza's submission.

Zelaya Romero subsequently watched as assassins pulled people out of the cars and executed them in the street.

In approximately 2013 or 2014, Zelaya Romero assisted in the recovery of a load of cocaine from an aircraft that was forced to conduct an emergency landing after being intercepted by the Honduran Air Force. As bales of cocaine were unloaded from the plane and brought to nearby palm fields by other workers, Zelaya Romero attempted to provide protection while possessing an AR-15 rifle, and others in the security team possessed AR-15s, rocket-propelled grenades, and pistols.

### D. The DEA's Investigation

Beginning in late 2013, the DEA used assistance from CW-1 to target several members and associates of the Drug-Trafficking Organization, including the defendants and Fabio Porfirio Lobo ("Lobo"), the son of former Honduran president Porfirio "Pepe" Lobo Sosa.[5]

In December 2013, Lobo met in Honduras with CW-1, who used a recording device during the meeting.[6] Acting at the direction of the DEA, CW-1 told Lobo that a Colombian was sending a multi-ton load of cocaine to Honduras, which the Drug-Trafficking Organization was

---

[5] Lobo Sosa was elected president of Honduras in November 2009. He took office in January 2010 and was succeeded in late 2013 by Juan Orlando Hernandez. *See generally* Congressional Research Service, *Honduran Political Crisis, June 2009-January 2010* at 1, *available at* https://www.fas.org/sgp/crs/row/R41064.pdf.

[6] The Government's descriptions herein of certain recordings, which have been produced to the defendants, are based on draft summary translations, which have also been produced. The draft translations are subject to revision, however, and the Government may seek to offer additional recordings during its case-in-chief that have been produced to the defendants during discovery but are not discussed in this submission.

going to receive and transport for "El Chapo", *i.e.*, former leader of the Mexican Sinaloa Cartel Joaquín Guzmán ("El Chapo").  Lobo agreed to provide logistical support and security for the cocaine in exchange for a financial stake in approximately 200 kilograms of cocaine (worth over a million dollars).

In February 2014, defendant Avila Meza provided security at a meeting between CW-1 and a sibling of a high-ranking Honduran government official, where they discussed business entities that CW-1 had used as vehicles for laundering drug proceeds.

In March 2014, CW-1 and a confidential source acting at the direction of the DEA ("CS-1") met with Lobo in Honduras.  CS-1 purported to be a representative of El Chapo, and used a recording device during the meeting.  During the meeting, Lobo confirmed that he was willing to facilitate the transportation of the cocaine, and that he expected to be compensated with 200 kilograms from the shipment.

In May 2014, Lobo met with CW-1 and two confidential sources who are referred to in the defendants' submissions as Jose Santos-Pena and Jose Santos-Hernandez.  Santos-Pena and Santos-Hernandez purported to be additional representatives of El Chapo, and they met with Lobo twice to discuss the cocaine load.  Following those meetings, Lobo, Santos-Pena, and Santos-Hernandez met with the defendants in Honduras.  Santos-Pena and Santos-Hernandez recorded the meeting.  Gathered around a table in the backyard of a residence, the defendants described the security that they would arrange and provide for the drug load in Honduras.  They placed a map on the table and also used a laptop computer to illustrate potential routes for the cocaine that would be safest to avoid interdictions.  They discussed carrying firearms and bribes that would need to

be paid at law-enforcement checkpoints as the drugs were brought to San Pedro Sula.  For their role in the anticipated transaction, the defendants agreed to accept $100,000 each and an additional $200,000 to pay bribes to other law enforcement, on the express understanding that they would also be provided with vehicles and weapons to use during the operation.

After meeting with the defendants, Lobo escorted Santos-Pena to a meeting with a high-ranking Honduran official inside a government office.  Santos-Pena requested assistance in the drug transaction, but the official declined.

## III.  The Honduran Special Commission Investigating the Honduran National Police

In April 2016, the Government of Honduras declared an "emergency situation" with respect to the *Pólicia National de Honduras*, and established a Special Commission with authority to investigate corruption and dismiss or suspend its members (the "Honduran Special Commission").  On August 8, 2016, the Government submitted a request for legal assistance to the Government of Honduras (the "MLAT Request") seeking, among other things: (i) investigative files and evidence relating to the defendants that were reviewed by the Honduran Special Commission; and (ii) reports reflecting determinations by the Honduran Special Commission relating to the defendants.  (*See* Dkt. No. 95-2 at 9 (the MLAT Request)).  Although the Government requested a response on an urgent basis, no later than September 1, 2016, Honduras has not yet provided any materials in response to the MLAT Request.  (*See id.* at 1-2).

## IV.  Procedural History

On March 18, 2015, Lobo was charged in Indictment 15 Cr. 174 (LGS) with participating in a conspiracy to import cocaine into the United States, in violation of Title 21,

United States Code, Section 963. On May 20, 2015, Lobo was arrested by Haitian authorities in Port-au-Prince after traveling to Haiti expecting to pick up drug proceeds from Santos-Pena. Lobo pleaded guilty on May 16, 2016, and has not yet been sentenced.

On June 29, 2016, the defendants were charged in Superseding Indictment S1 15 C. 174 (LGS) (the "Indictment") with: (i) participating in a conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Section 963 (Count One); and (ii) a conspiracy to use and carry firearms during and in relation to the crime charged in Count One, and to possess firearms in furtherance of the crime charged in Count One, in violation of Title 18, United States Code, Section 924(o) (Count Three). Zelaya Romero is also charged, in Count Two, with using and carrying machineguns and destructive devices during and in relation to the crime charged in Count One, and possessing machinegun guns and destructive devices in furtherance of the crime charged in Count One, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii).

On July 11, 2016, defendants Mejia Vargas, Avila Meza, Zavala Velasquez, Lopez Flores, and Cruz Chavez waived extradition in Honduras and surrendered voluntarily. Zelaya Romero was extradited to the United States by Honduras, and he arrived in this District on December 14, 2016.

## V. Discovery Produced by the Government

The Government began producing discovery in August 2016, and reproduced the same materials to Zelaya Romero upon his arrival in the United States.[7] The Government's productions have included:

- Consensually recorded videos obtained by CW-1, CS-1, Santos-Pena, and Santos-Hernandez;

- Consensually obtained electronic communications between CW-1 and Lobo;

- The MLAT Request (*see* dkt. no. 95-2);

- Draft summary translations relating to many of the consensual recordings and communications;

- Two search warrant affidavits that contain narrative descriptions relating to the Government's investigation and evidence (*see* Exs. A, B);

- Two applications for email header data, submitted pursuant to Title 18, United States Code, Section 2703(d), which also contain narrative descriptions relating to the Government's investigation and evidence (*see* Exs. C, D);[8]

---

[7] Although counsel for Zavala Velasquez conveys surprise that "indeed, even as I write, I have just now received an email from the government to alert me to the fact that there is additional discovery awaiting collection" (Zavala Velasquez Mem. at 1), the Government stated explicitly at the last status conference that it intended to make an additional production (12/15/16 Tr. 7). Counsel for Zavala Velasquez also asserts, incorrectly, that the Government failed to respond to "extensive requests" for discovery by counsel for Avila Meza. (Zavala Velasquez Mem. at 3). The Government responded to Ms. George's letter dated December 19, 2016, which was not transmitted until December 22, 2016—apparently due to "an email-related error" (*id.*)—on December 23, 2016.

[8] The search warrant affidavits and applications pursuant to Section 2703(d) were produced to the defendants subject to a protective order restricting their dissemination. Because these materials disclose some aspects of the ongoing investigation, the Government respectfully requests that Exhibits A, B, C, and D be maintained under seal.

- Email data relating to accounts maintained by Lobo and certain of his relatives, obtained pursuant to search warrants issued based on one of the above-referenced affidavits;

- Facebook data relating to an account maintained by Lobo, obtained pursuant to a search warrant issued based on one of the above-referenced affidavits; and

- Contents of two electronic devices seized from Lobo in connection with his May 20, 2015 arrest.

On January 13, 2017, the Government provided defense counsel with transcripts of a suppression hearing in *United States* v. *Campo Flores, et ano.*, No. 15 Cr. 765 (PAC), at which both Santos-Pena and Santos-Hernandez testified, and the trial testimony of Santos-Pena in the same case.

## ARGUMENT

### I.  The Defendants Are Not Entitled to Bills of Particulars

The Indictment describes the Government's theory of the case, and its productions have exceeded the requirements of Rule 16.  The defendants' motions for bills of particulars seek to require the Government to go further still.  But the information they have requested is not required by Rule 16 or necessary to adequately prepare their defenses.  In addition, for the reasons set forth in the *Ex Parte* Bove Declaration, the requested disclosures would pose substantial risks to the safety of others and the integrity of ongoing investigations.  Accordingly, the defendants' motions for bills of particulars should be denied.

#### A.  The Defendants' Requests

Read collectively, the defendants seek the following particulars:

- <u>Request 1</u>:  The dates each defendant joined and "last participated" in the two charged conspiracies (Lopez Flores Mem. at 8 (Requests 1, 3); Avila Meza Mem. at 7 ¶¶ (A), (C); Zavala Velasquez Mem. at 4);

- Request 2: The date, location, and description of each overt act committed in furtherance of each charged conspiracy (Lopez Flores Mem. at 8-10 (Requests 2, 4, 5, 7); Avila Meza Mem. at 7 ¶¶ (B), (C); *id.* at 8 ¶ (A));

- Request 3: The "illegal substance and the quantity of same involved in each [overt] act" in furtherance of the conspiracy charged in Count One (Avila Meza Mem. at 8 ¶ (C)(iii));

- Request 4: The identities of all co-conspirators (Lopez Flores Mem. at 9-10 (Request 6); Avila Meza Mem. at 8 ¶ (D));

- Request 5: Reports and testimonial information relating to videos and photographs produced by the Government during discovery (Avila Meza Mot. Ex. 1 at 1 (dkt. no. 96-1));[9] and

- Request 6: Communications relating any of the defendants by the Honduran National Police or the Honduran Special Commission with any part of the United States (Zavala Velasquez Mem. at 2).

## B. Applicable Law

"Rule 7(f) of the Federal Rules of Criminal Procedure provides that a court may direct the Government to file a bill of particulars." *United States* v. *Wedd*, No. 15 Cr. 616, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (citing Fed. R. Crim. P. 7(f)). A bill of particulars

---

[9] Avila Meza also requests "any and all grand jury transcripts" related to this case, and search warrant materials relating to searches of email accounts and electronic devices used by Lobo or his relatives. (Avila Meza Mot. Ex. 1 at 1, 6 (dkt. no. 96-1)). Avila Meza has cited neither legal authority nor a factual basis for his request for transcripts of grand jury proceedings, and the Government has not provided those transcripts. *E.g.*, *United States* v. *Swain*, No. 08 Cr. 1175, 2010 WL 23317, at *2 (S.D.N.Y. Jan. 5, 2010) ("A defendant seeking disclosure under [Rule 6(e) must show a particularized need that outweighs the need for secrecy." (internal quotation marks omitted)). Notwithstanding the absence of standing to challenge the searches at issue in Avila Meza's request, the Government produced the warrants and related materials to all defendants on December 23, 2016.

is "required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *Id.* (quoting *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)). This is so because "[t]he purpose of the bill of particulars is to avoid prejudicial surprise at trial and give [a] defendant sufficient information to meet the charges against him." *Id.* Thus, "a 'bill of particulars is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'" *United States* v. *Yun Lee*, No. 13 Cr. 290, 2013 WL 4889178, at *1 (S.D.N.Y. Sept. 9, 2013) (quoting *United States* v. *Miller*, No. 12 Cr. 368, 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012)). "Nor is the proper scope and function of a bill of particulars to obtain disclosure of evidence or witnesses to be offered by the government at trial." *United States* v. *Dames*, 380 F. Supp. 2d 270, 274 (S.D.N.Y. 2005).

Ordering bills of particulars only insofar as necessary to facilitate *reasonable* defense preparation and to avoid *unfair* surprise at trial makes sense. The Government has a legitimate and weighty interest in avoiding the types of safety risks that can arise from making disclosures beyond those required by Rule 16, *Giglio*, and *Brady*. *See United States* v. *Gotti*, No. 02 Cr. 743, 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004) (denying disclosure of the identities of co-conspirators, witnesses and victims because the "Government has a legitimate concern about the safety of those individuals it intends to call at trial"). Detailed inquiries into the Government's evidence pursuant to Rule 7(f)—long in advance of trial—unduly restrict the Government in presenting additional proof and argument to the jury based on resources devoted to trial preparation and the ongoing investigation in the time before the trial. *See, e.g.*, *United States* v. *Jimenez*, 824

F. Supp. 351, 363 (S.D.N.Y. 1993). Finally, "[t]he danger of defendants tailoring their testimony to explain away the Government's case, which has been disclosed in advance, is not unreal." *United States* v. *Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).

## C. Discussion

Contrary to the defendants' assertions, "[t]he prosecution need not particularize all of its evidence." *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). "Nor will a defendant be permitted to use a request for a bill of particulars to compel the government to disclose the manner in which it will prove the charges or preview the government's evidence or legal theory." *United States* v. *Guerrero*, 669 F. Supp. 2d 417, 426 (S.D.N.Y. 2009). "Simply put, a defendant may not employ a bill of particulars as a general investigative tool." *Id.* Because that is precisely what the defendants are seeking to do here, and they clearly have sufficient information relating to the nature of the charges against them, their motions should be denied.[10]

The Indictment contains a three-page, six-paragraph description of the Government's theory of the case. The Government's productions to date have augmented that disclosure and exceeded the requirements of Rule 16. *See United States* v. *Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995) ("In deciding whether a bill of particulars is needed, the court must determine whether the information sought has been provided elsewhere, such as in other

---

[10] The defendants' motions for bills of particulars are also procedurally defective, in that no defendant filed an affidavit as required by Local Rule 16.1. *See United States* v. *Ojeikere*, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) ("[T]he defendant's failure to file an affidavit as required by Local Criminal Rule 16.1 is a sufficient basis on which to deny his motion for a bill of particulars").

items provided by discovery, responses made to requests for particulars, prior proceedings, and the indictment itself."). The discovery has included consensually recorded meetings, draft summary translations, and narrative descriptions of the Government's evidence—including descriptions of witness information not otherwise subject to disclosure at this stage of the proceedings pursuant to Rule 16, *Brady*, or *Giglio*—contained in search warrant affidavits, applications pursuant to Section 2703(d), and the MLAT Request. (*See* Ex. A at 24-28; Ex. B at 39-62; Ex. C at 5-7; Ex. D at 3-5; Dkt. No. 95-2 (the MLAT Request)). This brief provides even greater detail regarding the Government's theory of the case, the recordings it views as most central to its anticipated trial proof, and the participants in those recordings.

Even before this filing, the Government's robust disclosures have plainly facilitated a thorough defense investigation. For example, the defendants have correctly concluded that Santos-Pena and Santos-Hernandez were two of the confidential sources who acted at the direction of the DEA during the investigation, and identified at least 10 other individuals whom the defense considers relevant to the case (including two individuals they refer to as cooperating witnesses). (*See* Avila Meza Mot. Ex. 1 at 1-2, 5). In other words, before a trial date has even been scheduled, the defense has been able to identify, in many instances by name, at least 12 individuals who they have concluded to be potential Government witnesses. These identifications betray significant knowledge on the part of the defense about the membership of the Drug-Trafficking Organization, the nature of the charged offenses, and the Government's evidence. Thus, the defendants have more than enough information to consider whether to proceed to trial, adequately prepare their defenses, and avoid unfair surprise from the Government, and their further Requests are meritless.

Requests 1, 2.  The defendants are not entitled to additional information regarding when they joined the charged conspiracies, when they "last participated" in them, and all overt acts in furtherance of these conspiracies.  "[I]n this circuit, demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."  *United States* v. *Santana*, No. 13 Cr. 147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (internal quotation marks omitted).  Indeed, "[i]n the context of prosecutions of narcotics conspiracies, courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy."  *United States* v. *Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001).[11]  In light of the extent of the Government's pretrial disclosures, there is no need to depart from the weight of the authority by granting these aspects of the defendants' requests.

Request 3.  The defendants are not entitled to further information relating to the Government's theory of the quantity of drugs at issue in this case.  The Indictment alleges with respect to Count One that the offense involved more than five kilograms of cocaine, which makes plain the statutory penalties faced by the defendants.  (Indictment ¶ 10).  The Indictment also

---

[11] *Accord United States* v. *Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."); *United States* v. *Guerrero*, 669 F. Supp. 2d at 426 ("'[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied.'" (quoting *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001))).

alleges, as one "example," that each defendant agreed to participate in the distribution of a "multi-ton load of cocaine." (Indictment ¶ 4). That single load far exceeded the largest drug quantity contemplated under U.S.S.G. § 2D1.1, thereby leaving little ambiguity about the defendants' exposure under the Sentencing Guidelines. The defendants are also on notice, through the Indictment and as a result of their access to the MLAT Request and this filing, that the Government will seek to prove at trial that the conspiracy involved the transportation of numerous additional loads of cocaine in, at minimum, multi-hundred-kilogram quantities. (*See* Indictment ¶ 2). In *United States* v. *Ojeda*, the Court of Appeals concluded that a defendant "failed to establish any resulting prejudice" based on the denial of a bill of particulars where he argued that he was "surprised at trial by the testimony of a cooperating witness concerning the circumstances of certain cocaine transactions, including the amounts of cocaine involved and the location of the transactions." 412 F. App'x 410, 412 (2d Cir. 2011) (summary order). The court reasoned that "[a]ny surprise . . . would have been minimal in light of previously disclosed evidence. For example, on telephone recordings disclosed prior to trial, Ojeda was heard discussing the same drug quantities and transaction site described by the cooperating witness." *Id.*; *see also United States* v. *Vondette*, 248 F. Supp. 2d 149, 154 (E.D.N.Y. 2001) ("[I]t does not appear that the Government has discovery obligations with regard to the exact quantity of narcotics allegedly involved in this conspiracy before the trial begins."). As in *Ojeda* and *Vondette*, in light of the pretrial disclosures to date, the defendants could not reasonably claim to be surprised about the Government's drug-quantity proof should they proceed to trial.

Request 4.  The defendants are not entitled to further information regarding individuals whom the Government presently considers to be uncharged or unnamed co-conspirators.  *See United States* v. *Campo Flores*, No. 15 Cr. 765, 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016) ("[T]he Government does not have to provide information on the identities of the individuals whom the Government at present regards as uncharged co-conspirators."); *see also United States* v. *Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990) (affirming denial of request for identities of "other persons 'known and unknown' as alleged in . . . the indictment").[12]  This is especially true in light of the fact that the defendants have already identified 12 individuals they regard as potential witnesses in the case.  More importantly, for the reasons set forth in the *Ex Parte* Bove Declaration, such disclosures would pose substantial risks to the safety of others and the integrity of ongoing investigations.  These two considerations are central to the test articulated in *Nachamie*, which is relied upon by Lopez Flores.  (*See* Lopez Flores Mem. at 9-

---

[12] *Accord United States* v. *Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991) ("A defendant may be indicted and convicted despite the names of his co-conspirators remaining unknown . . . ."); *United States* v. *DiCesare*, 765 F.2d 890, 897-98 (9th Cir. 1985) (holding that bill of particulars "not warrant[ed]" to obtain, among other things "the names of any unknown co-conspirators"); *United States* v. *Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved."); *United States* v. *Glisson*, No. 03 Cr. 148, 2003 WL 21709502, at *3 (S.D.N.Y. July 23, 2003) ("Courts have been highly reluctant to require a bill of particulars when a defendant has asked for specific identities as to co-conspirators or others allegedly involved in the crime."); *United States* v. *Rodriguez*, No. 99 Cr. 367, 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators); *United States* v. *Gallo*, No. 98 Cr. 338, 1999 WL 9848, at *5 (S.D.N.Y. Jan. 11, 1999) (same); *United States* v. *Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (same); *United States* v. *Muyet*, 945 F. Supp. at 599 (same).

10 (citing *United States* v. *Nachamie*, 91 F. Supp. 2d 552 (S.D.N.Y. 2000)). None of the opinions cited by Lopez Flores in support of the request for identification of co-conspirators involved safety issues to the same extent as this case (*see id.* at 9).[13] *See United States* v. *Conyers*, No. 13 Cr. 537, 2016 WL 7189850, at *8 (S.D.N.Y. Dec. 9, 2016) ("[E]arly disclosure of witness identities is particularly disfavored in cases involving violent crimes, like the racketeering enterprise charged in this case, because identifying the Government's witnesses substantially in advance of trial may increase the risk of harm to them."); *United States* v. *Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005) ("[C]ourts in this circuit are especially reluctant to require the disclosure of witness lists in cases such as this one that involve allegations of crimes of violence."). And Lopez Flores acknowledges that "'criminals operate with a high degree of impunity Honduras,'" and that the country has "'one of the highest murder rates in the world.'" (Lopez Flores Mem. at 2-3 (quoting

---

[13] *See United States* v. *Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009) ("The government has asserted no basis to fear that revealing the identities of the unindicted co-conspirators will jeopardize their safety, create risk of witness tampering, or compromise an ongoing government investigation."); *United States v. Oruche*, No. 07 Cr. 124, 2008 WL 612694, *4 (S.D.N.Y. Mar. 5, 2008) (no arguments or analysis relating to violence or safety risks); *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000) ("[T]here is no legitimate concern that disclosing the names of unindicted co-conspirators will endanger those individuals or compromise the Government's investigation."); *United States* v. *Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999) (no arguments or analysis relating to violence or safety risks resulting from disclosure); *United States* v. *Strawberry*, 892 F. Supp. 519, 527 (S.D.N.Y. 1995) (no arguments or analysis relating to violence or safety risks resulting from disclosure in tax evasion case); *United States* v. *Allocco*, 801 F. Supp. 1000, 1003 (E.D.N.Y. 1992) (no arguments or analysis relating to violence or safety risks resulting from disclosure); *United States* v. *Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (same); *United States* v. *Chovanec*, 467 F. Supp. 41, 46 (S.D.N.Y. 1979) (same).

Dept. of State travel warning)). Accordingly, the defendants' requests for identification of co-conspirators should be denied.

Request 5. Avila Meza demands on behalf of the defendants—without citation to authority—information and reports relating to photographs and videos produced during discovery. (Avila Meza Mot. Ex. 1 at 1 (dkt. no. 96-1)). Photographs and videos produced to date were created by individuals acting at the direction of law enforcement. Avila Meza's request seeks the premature identification of those potential Government witnesses (*see id.* ¶ A (seeking the "name of the person who captured each photo or video")), and the early disclosure of witness statements relating to the manner in which the evidence was obtained. The defendants have failed to explain why this information should be disclosed or provide any authority for such disclosure, and Rule 16 expressly does not apply to the materials and information Avila Meza seeks at this stage of the proceedings. *See* Fed. R. Crim. P. 16(a)(2) ("[T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."). Accordingly, Request 5 should be denied.

Request 6. The undersigned prosecutors are unaware of communications between the United States and the Honduran Special Commission or the Honduran National Police. (*See* Zavala Velasquez Mem. at 2). Moreover, although the Government is mindful of its obligations under *Brady*, it is not self-evident based on the nature of the defendants' request why any such

communications, if they existed, would be discoverable.[14]  *See Perez* v. *United States*, 502 F. Supp. 2d 301, 309 n.8 (S.D.N.Y. 2006) ("The prosecutor is not responsible to disclose exculpatory information that the prosecutor does not know exists, which is only in the possession of a government agent or agency that is not directly involved in the prosecution of the criminal case. Such a requirement would 'condemn the prosecution of criminal cases to a state of paralysis.'" (quoting *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998))).  Avila Meza also requests from the Government, independently of the MLAT Request, materials he believes are maintained by the Honduran National Police, including "[p]ersonnel files," "professional records," and "reports or charges." (Avila Meza Mot. Ex. 1 at 1-2).  The Government will produce any materials that it receives from the Honduran government in response to the MLAT Request that are subject to its discovery obligations within the timeframe required by those obligations.  But no authority *requires* the Government to obtain materials from a foreign sovereign not otherwise in its possession.  *E.g.*, *United States* v. *Lee*, 723 F.3d 134, 142 (2d Cir. 2013) ("[W]e note that [the defendant] was not entitled to these [Jamaican] documents under any arguable rule of discovery because these materials were not even within the 'government's possession, custody, or control.'" (quoting Fed. R. Crim. P. 16(a)(1)(E)); *United States* v. *Yousef*, 327 F.3d 56, 129 (2d Cir. 2003) ("The Government is not under an obligation to produce prior statements of foreign law enforcement officials that it does not possess.").  Finally, the defendants are not without recourse

---

[14] Zavala Velasquez simply asserts, without further detail, that "[a]ll these items are materials to my defense."  (Zavala Velasquez Mem. at 2).

with respect to collecting evidence located outside the United States; they may seek to use Rule 15 and letters rogatory to secure evidence, including witness testimony, from Honduras. *E.g.*, *United States* v. *Fawwaz*, No. 98 Cr. 1023, 2014 WL 627083, at \*2 (S.D.N.Y. Feb. 18, 2014) (denying defendant's pretrial motion to compel Government to acquire materials in the possession of a foreign government). Therefore, the defendants' requests relating to communications and other materials from the Honduran National Police and the Honduran Special Commission should be denied.

## II. The Defendants' Request for *Brady* Material Is Moot and the Request for Early Production of Jencks Act and *Giglio* Material Should Be Denied

The Government has notified the defendants that it is in compliance with its obligations under *Giglio* and *Brady*, voluntarily has made early disclosure of *Giglio* material with respect to Santos-Pena and Santos-Hernandez, and committed to prospective compliance with all of its discovery obligations. Accordingly, the defendants' motion to compel early disclosures should be denied.

### A. The Government Is in Compliance With Its *Brady* Obligations

Under *Brady* v. *Maryland*, 373 U.S. 83 (1963), the Government is obligated by the Due Process Clause of the Fifth Amendment "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). Evidence is "material" under *Brady* only if disclosure of the evidence would lead to "a reasonable probability of a different result" in the outcome of a trial. *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

Courts in this District have denied defense requests for specific *Brady* material where the Government has made good-faith representations that it understands its discovery obligations and will comply with these obligations in the future. *See, e.g.*, *United States* v. *Campo Flores*, No. 15 Cr. 765, 2016 WL 5946472, at *11; *United States* v. *Young*, No. 10 Cr. 640, 2011 WL 838907, at *4 (S.D.N.Y. Mar. 9, 2011) ("[The Government] asserts that it will provide [*Brady*] materials if discovered 'in time for [their] effective use at trial,' as required by *United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). This is sufficient. Accordingly, the motion is moot."). In light of the Government's acknowledgments and assurances in this regard, the defendants' motion to compel production of *Brady* material should be denied.

Avila Meza asserts, without citation to authority, "that any and all statements made by Jose Santos-Pena and Jose Santos-Hernandez and or reports or records constitute *Brady* material and should be remitted forthwith." (Avila Meza Mot. at 9; *see also* Lopez Flores Mem. at 11 (demanding "all *Giglio* material . . . as soon as the government learns of it")). Although the Government does not dispute that statements and reports relating to Santos-Pena and Santos-Hernandez may have impeachment value under *Giglio* with respect to potential Government witnesses, none of these materials are exculpatory as to the defendants in this case.

> In the Southern District of New York, *Giglio* material is customarily produced "with Section 3500 material in recognition of the fact that this type of *Brady* material *does not ordinarily require any independent investigation to use it effectively at trial*. Consequently, neither the courts nor the parties in criminal cases have assumed that there is any pretrial right to disclosure of *Giglio* material.

*United States* v. *Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015) (emphasis added) (quoting *United States* v. *Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14,

2000)); *see also United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) ("[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant."); *United States* v. *Frank*, 11 F. Supp. 2d 322, 323 (S.D.N.Y. 1998) (rejecting argument that "*Giglio* material should be treated like all other *Brady* material and disclosed to him as soon as it comes into the Government's possession"). The Government has already made certain *Giglio* disclosures relating to Santos-Pena and Santos-Hernandez, which are more than sufficient at this point in the case to allow the defendants to conduct pretrial investigations, prepare their defenses, and plan for cross-examinations at hearings or trial. Absent unforeseen circumstances, the Government will make any further disclosures relating to Santos-Pena and Santos-Hernandez at the same time it produces Jencks Act and *Giglio* material for other witnesses.

## B. The Defendants Are Not Entitled to Additional Early Disclosures Regarding Government Witnesses

The defendants' additional witness-related requests seek, effectively, a witness list from the Government and premature disclosures under the Jencks Act and *Giglio*. These requests are meritless and should be denied.

### 1. Applicable Law

"[T]he Jencks Act provides the exclusive procedure for discovering statements that government witnesses have given to law enforcement agencies." *In re United States*, 834 F.2d 283, 286 (2d Cir. 1987); *see also* Fed. R. Crim. P. 16(a)(2). "[D]istrict courts lack the power to mandate" the "early production" of such witness statements. *United States* v. *Miles*, No. 11 Cr.

581 (JFK), 2012 WL 4178274, at *8 (S.D.N.Y. Sept. 20, 2012). The Jencks Act calls for the production of witness statements after a witness "has testified on direct examination," 18 U.S.C. § 3500(b), but the Government customarily provides witness statements prior to trial.

"Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *United States* v. *Coppa*, 267 F.3d at 146. Thus, the production of *Giglio* material "shortly prior to the commencement of trial" is "customary in this district." *United States* v. *Miller*, No. 12 Cr. 368, 2012 WL 4791992, at *2 (S.D.N.Y. Oct. 9, 2012).[15] There are sound reasons for this rule. For one, impeachment material "does not ordinarily require any independent investigation in order to use it effectively at trial." *United States* v. *Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000). Also, requiring early disclosure of *Giglio* material would effectively require the Government to produce a witness list well in advance of trial. *See id.*

With respect to the identities of confidential sources and cooperating witnesses, the "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States* v. *Shamsideen*, No. 03 Cr. 1313, 2004 WL 1179305,

---

[15] *Accord United States* v. *Viera*, No. 14 Cr. 83, 2015 WL 171848, at *6 (S.D.N.Y. Jan. 14, 2015) (holding that production of *Giglio* material one week before trial and Jencks Act material for all witnesses on the Friday before trial "comports with the defendants' due process rights" (collecting cases)); *United States* v. *Davis*, 57 F. Supp. 3d 363, 369 (S.D.N.Y. 2014) (approving production of *Giglio* material, including with respect to a confidential informant and cooperating witness by "reveal[ing] their identities," one week before trial); *United States* v. *Davis*, No. 06 Cr. 911, 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009).

at *11 (S.D.N.Y. Mar. 31, 2004) (quoting *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957) and *United States* v. *Jackson*, 345 F.3d 59, 69 (2d Cir. 2003)). To overcome this qualified privilege against disclosure—often referred to as the informant's privilege—"[t]he defendant bears the burden of showing the need for a disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States* v. *Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citation omitted).

Overcoming the informant's privilege requires the defendant to do more than simply show that the informant was a witness to the crime charged. *See United States* v. *Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (citing *United States* v. *Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986)); *United States* v. *Castro*, No. 94 Cr. 809, 1995 WL 6235, *2 (S.D.N.Y. Jan. 6, 1995). Nor can a defendant meet his burden by speculating about the Government's case, or the informant's role therein. *See United States* v. *Fields*, 113 F.3d at 324 ("Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden . . . ."). Instead, the defendant must make a specific showing that "the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause." *United States* v. *Saa*, 859 F.2d at 1073 (internal quotation marks omitted) (holding that defendant had made requisite showing where NYPD officers gave conflicting testimony regarding defendant's whereabouts during drug transaction, and informant could have provided additional information on defendant's location during transaction). Since *Saa*, the Second Circuit has found disclosure at trial of the identity of informants, or the Government's production at trial of the informants for testimony, sufficient to permit a defendant to conduct a meaningful defense. *See*

27

*DiBlasio* v. *Keane*, 932 F.2d 1038, 1043 (2d Cir. 1991) (permitting government to physically produce informant for testimony to address defendant's need to obtain informant's identity).

## 2. Discussion

Neither Rule 16 nor the Jencks Act requires the Government to produce statements or reports by any of its witnesses before trial. *See* Fed. R. Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500."). Nevertheless, the Government will complete its disclosures pursuant to the Jencks Act and *Giglio* at least 10 days prior to the as-of-yet unscheduled trial, and make disclosures pursuant to Rule 404(b) and 702 prior to trial pursuant to a schedule set by the Court. *See United States* v. *Trippe*, 171 F. Supp. 2d 230, 238 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense . . . at least one day before the Government witness is called to testify."); *United States* v. *Muyet*, 945 F. Supp. 586, 602 n.16 (S.D.N.Y. 1996) (reasoning that calling informants to testify at trial, coupled with production of impeachment material one week prior to testimony of each witness, allowed "defendants to conduct a meaningful defense. In light of these undertakings and the well-established practices in this District, the defendants' motions for earlier disclosures should be denied.

Finally, the defendants are not entitled at this time to further information relating to the identities of cooperating witness and confidential informants. (*See* Avila Meza Mot. Ex. 1 at 5). They have failed to overcome the informant's privilege because they have not made a specific showing as to how the identities of these witnesses would be relevant and helpful to their

28

defense.  *See, e.g.*, *United States* v. *Campagna*, No. 16 Cr. 78 (LGS), 2016 WL 4367992, at *6 (S.D.N.Y. Aug. 11, 2016) (denying motion for disclosure of informant identities because defendant "speculated that disclosure will be helpful to his defense, but has not met the burden required by law.  The Government has committed to produce impeachment or other material under *Giglio* v. *United States*, 405 U.S. 150, 154 (1972), prior to trial or, if appropriate, prior to any fact hearing, with sufficient time for defense counsel to prepare for cross-examination").  "[M]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure."  *United States* v. *Santoro*, No. 03 Cr. 484, 2004 WL 2346621, at *3 (S.D.N.Y. Oct. 19, 2004); *see also United States* v. *Belin*, No. 99 Cr. 214, 2000 WL 679138, at *10 (S.D.N.Y. May 24, 2000) (rejecting argument that "in order to properly prepare a defense in this matter, it is important that the defense be aware of all information related to the informants' credibility and background" as "insufficient to show how confidential informants' potential testimony would be relevant to the defense, or even, what the defense would be").  Further, "[i]n narcotics cases, early disclosure of informants' true names with other identifying information can have repercussions that can prevent a fair trial."  *United States* v. *Manley*, 781 F. Supp. 296, 298 (S.D.N.Y. 1992).

Here, even if testimony or information from confidential sources and cooperating witness is relevant and helpful to the defense, there are significant safety concerns justifying more limited disclosures closer to trial.  (*See generally Ex Parte* Bove Decl.).  Some of these witnesses have participated in multiple significant international drug-trafficking investigations, including cases focused on some of the most violent places in the world targeting extremely violent

29

criminals.  As such, early disclosure of the confidential sources' identities would put them, their relatives, and their associates at great personal risk.  *See United States* v. *Jimenez*, 824 F. Supp. 351, 365 (S.D.N.Y. 1993) (where defendants failed to make sufficient showing as to how informants' testimony would be material to their defense, Government's interest in protecting informants' safety outweighed need to learn informants' identities).   Therefore, because the defendants have failed to overcome the informant's privilege, and because of the risks attendant to such early disclosures, the defendants request should be denied.

## III.   The Defendants Should Be Ordered to Provide Reciprocal Discovery Forthwith

In a July 2016 email to the Government, an attorney acting on behalf of Zavala Velasquez, who was not ultimately retained to represent him, indicated that she possessed "documents . . . regarding the public authority defense."  Moreover, by letter dated December 19, 2016, counsel for Avila Meza informed the Government that "we intend to provide copies of certain records pertaining to the defendant as part of defendant's reciprocal discovery obligation." (Avila Meza Mot. at 9).

At the December 15, 2016 conference, the Court set a deadline for discovery of December 23, 2016.  The Government has complied with its discovery obligations under Rule 16(a)(1)(E)-(F), and has requested in writing reciprocal discovery from the defendants pursuant to Rule 16(b) on several occasions.[16]  (*See* Jan. 13, 2017 Decl. of Emil J. Bove III ¶ 2).  To date, none

---

[16] The Government has also requested, from all defendants, notice of any anticipated public authority defenses pursuant to Rule 12.3.  *See* Fed. R. Crim. P. 12.3(a)(2) (describing required contents of such notice).  To date, no defendant has provided such notice.

of the defendants has provided reciprocal discovery. The Government is entitled to these materials. *See United States* v. *Jasper*, No. 00 Cr. 825, 2003 WL 223212, at *6 (S.D.N.Y. Jan. 31, 2003) ("'[T]he government's voluntary turnover of desired material to defendant must have been deemed to have been based upon the implied condition that the defense would reciprocate, if necessary, at a later date,' and therefore grants the government's request and orders defendant's counsel to comply with his obligations as set forth in Rule 16(b)(1)(A) and produce any materials that he intends to use in defendant's case-in-chief at trial." (quoting *United States* v. *Estremera*, 531 F.2d 1103, 1113 (2d Cir. 1976))). Accordingly, the Government respectfully requests that the Court order all defendants to produce forthwith all materials called for by Rule 16(b)(1)(A)-(B) that are in their possession, custody, or control.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendants' discovery motions should be denied, and that the defendants should be ordered to produce forthwith all material subject to Rule 16(b)(1)(A)-(B) that is in their possession, custody, or control.

Dated: New York, New York
      January 13, 2017

Respectfully Submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys

Cc:    Defense Counsel
      (Via ECF)