

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 7, 2018

<u>Via ECF</u>

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1106
New York, New York 10007

      Re:    *United States* v. *Carlos Jose Zavala Velasquez*,
              S4 15 Cr. 174 (LGS)

Dear Judge Schofield:

      The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for June 26, 2018, at 4:30 p.m., on the defendant's conviction of conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Sections 963, 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), and 960(b)(3). The defendant was a member of the *Pólicia National de Honduras*—the Honduran National Police—who corruptly used his position to support the criminal activities of large-scale drug traffickers and their associates. The defendant has acknowledged that for a period of years he worked hand-in-hand with one of the largest drug traffickers in Honduras and that he benefited significantly from the payments arising from that relationship. By doing so, the defendant contributed to an environment that allowed massive drug traffickers to thrive in his country and to import tons of cocaine into ours. Accordingly, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 210 to 240 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## RELEVANT BACKGROUND

**I.    Honduras: A Major Transshipment Point for U.S.-Bound Cocaine and Plagued by Violence**

      Honduras is one of the principal transshipment points in the world for cocaine that is produced in South America and imported into the United States. Beginning in at least 2004, multiple drug-trafficking organizations operating in Honduras and elsewhere worked in concert with politicians, law enforcement officials, and military personnel to receive multi-hundred-kilogram loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime

routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.

Drug traffickers paid bribes—sometimes styled as "campaign contributions"—to Honduran politicians holding and/or running for office, on the understanding that the politicians would support trafficker-friendly policies regarding matters such as investigative priorities and extradition policy. For further protection from official interference, and in order to facilitate the safe passage through Honduras of these massive loads of cocaine, drug traffickers also paid bribes to public officials—including certain members of the Honduran National Police—for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions. These extensive drug-trafficking networks contributed to Honduras becoming one of the most violent places in the world.

In April 2016, the Government of Honduras declared an "emergency situation" with respect to the Honduran National Police, and established a Special Commission with authority to investigate corruption and dismiss or suspend its members. The legislative decree establishing the Special Commission stated, in substance and in part, that the Honduran National Police needed to restore its trustworthiness and credibility as the institution responsible for ensuring the safety of Honduras.

## II.   The Government's Investigation[1]

### A.   Zavala Velasquez Participated in Large Scale Drug Trafficking Between 2009 and 2012

Prior to Zavala Velasquez's surrender in the summer of 2016, he was a member of the Honduran National Police for approximately 22 years.

Between at least approximately 2009 and 2012, Zavala Velasquez facilitated the drug-trafficking activities of an organization operated by a significant Honduran drug trafficker named Hector Emilio Fernandez Rosa, a\k\a "Don H," with assistance from Ruben Mejia, and Victor Hugo Diaz Morales, a/k/a "Rojo." Zavala Velasquez also worked with Gustavo Chinchilla, a/k/a "El Bombazo," and a member of the Honduran National Police named Motinio Lopez in furtherance of drug-trafficking activities.

The charge in the Superseding Information is based on Zavala Velasquez's activities with Fernandez Rosa's drug-trafficking organization. Zavala Velasquez provided information to one or more of these drug traffickers regarding ongoing law enforcement investigations so that the traffickers could plan transportation routes through Honduras for large loads of cocaine. On at least one occasion, Zavala Velasquez accompanied Diaz Morales during the transportation of a load of cocaine. Zavala Velasquez was paid between $5,000 and $20,000 each time he assisted the organization.

---

[1] The facts in the following section are included in paragraphs 7 through 15 of the Presentence Investigation Report.

In approximately 2014, Honduran authorities began to seize Fernandez Rosa's assets in Honduras. Zavala Velasquez sent a message to Fernandez Rosa, via co-defendant Mario Guillermo Mejia Vargas, that Zavala Velasquez was not involved in the investigations that led to those seizures. In approximately October 2014, Fernandez Rosa was provisionally arrested in Honduras based on a drug-trafficking charge in this District. He was subsequently extradited to the United States based on that charge in the case docketed 12 Cr. 844 (RJS).

### B.   Zavala Velasquez's Drug-trafficking Activities in 2014

In the first half of 2014, Zavala Velasquez participated in a training course along with certain of his co-defendants, including Juan Manuel Avila Meza and Mejia Vargas. During the course of the training, Avila Meza and Mejia Vargas asked Zavala Velasquez to participate in the transportation of cocaine for two Mexican drug traffickers – who were in fact confidential sources acting at the direction of the DEA (the "Sources") – from the La Mosquitia region in east Honduras to the Honduras-Guatemala border. Zavala Velasquez agreed with Avila Meza and Mejia Vargas to participate in and provide assistance with the cocaine shipment.

Approximately one week after Zavala Velasquez agreed to participate in the cocaine shipment, Mejia Vargas asked him to come to a meeting at a gas station near the airport in Tegucigalpa, Honduras (the "Gas Station Meeting"). Zavala Velasquez met with Mejia Vargas and Avila Meza, but they told Zavala Velasquez that the two Mexican drug traffickers, i.e., the Sources, could not attend.

Zavala Velasquez, Ludwig Criss Zelaya Romero, Mejia Vargas, Avila Meza, and Lopez Flores, among others, subsequently met with the Sources at a body shop in San Pedro Sula, Honduras (the "Body Shop Meeting"). During the meeting, the Sources provided an overview of the anticipated drug shipment and provided a pool of cash to Avila Meza to divide up as bribes to the others at the meeting.

In June 2014, Zavala Velasquez and the rest of his co-defendants – including Fabio Porfirio Lobo, the son of the former President of Honduras – met with the Sources in Honduras (the "Recorded Meeting"). During the Recorded Meeting, the sources made clear, in the presence of Zavala Velasquez and several of his co-defendants, that the cocaine was ultimately destined for the United States. The police defendants put a map of Honduras on the table to illustrate for the Sources the location of law enforcement checkpoints where people would need to be bribed during the transportation of the drugs. Each of the defendants spoke and participated in the discussion regarding the map and law enforcement checkpoints, and agreed to personally escort the load during segments of the transportation route while armed with their service weapons. The Sources told the defendants that they would also provide them with additional firearms, and that the defendants and their men should use those firearms rather than their service weapons in the event of a shootout. After extensive discussion, the defendants agreed to accept additional payments of $100,000 per person, as well as a $200,000 budget funded by the sources to pay bribes to their "subordinates" and other expenses.

Co-defendant Fabio Lobo was arrested in Haiti in May 2015. At no time prior to the summer of 2016 did Zavala Velasquez claim to United States or Honduran authorities that he had participated on behalf of law enforcement in any aspect of the investigation that led to

Lobo's arrest, including the Recorded Meeting where both Lobo and Zavala Velasquez were present.

### C. Zavala Velasquez's Post-Arrest Statement

On July 1, 2016, after the charges against Zavala Velasquez were made public, he participated in an interview with DEA personnel at an office of the Honduran National Police in Tegucigalpa. During the interview:

- Zavala Velasquez claimed falsely that he had been instrumental in the investigation of Fernandez Rosa.

- Zavala Velasquez claimed that approximately two days after he agreed with Avila Meza and Mejia Vargas to participate in the 2014 cocaine shipment, he reported the meeting to Commisario Rigoberto Osguera Mass of the Honduran National Police. Zavala Velasquez acknowledged that he did not document the information regarding Avila Meza and Mejia Vargas, and that his supervisor at the time was Commisario Orlin Javier Cerrato Cruz rather than Osguera Mass. Zavala Velasquez indicated that although Osguera Mass was not his supervisor, he was a "close friend."

- Zavala Velasquez did not recall telling Osguera Mass or Cerrato Cruz about the Gas Station Meeting, he made no efforts to record the meeting, and he did not prepare a report relating to the meeting. He also claimed that he could not remember what was discussed at the meeting.

- Zavala Velasquez did not disclose the Body Shop Meeting or the bribe payments made during the meeting.

- With respect to the Recorded Meeting, Zavala Velasquez said that he was summoned by Mejia Vargas to the same gas station near the airport in Tegucigalpa. Zavala Velasquez admitted that he did not tell Osguera Mass or Cerrato Cruz about the meeting. When Zavala Velasquez arrived at the gas station, he got in Mejia Vargas's vehicle and rode with Mejia Vargas and co-defendant Victor Lopez Flores to a house where the two Mexican drug traffickers were located. Zavala Velasquez admitted that he did not document the Recorded Meeting, and did not present information relating to the meeting to a Honduran prosecutor for purposes of prosecution.

A copy of the interview is attached as Exhibit A. On April 5, 2017, defense counsel produced to the Government: (i) an affidavit from a Honduran attorney named Jose Castro Ortiz; (ii) a purported audio recording of a July 7, 2016 meeting between Zavala Velasquez, Castro Ortiz, and Osguera Mass; and (iii) purported text messages between Zavala Velasquez and Osguera Mass. Based on those materials, the defendant claims, in substance, that he was acting at the direction of Honduran law enforcement in connection with his participation in the negotiations with the Sources.

## DISCUSSION

### I. A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. In particular, the seriousness of the offense, the need to promote respect for the law, and the importance of achieving general deterrence all support the imposition of a Guidelines sentence in this case.

The defendant's crime was serious and consequential to his country. As a member of the Honduran National Police, the defendant used his position of authority to assist drug traffickers that he had sworn to investigate and arrest. The defendant conspired with others, including one of the largest drug traffickers in Honduras, to import huge quantities of cocaine into the United States. The defendant's conduct also was not aberrational—he was engaged in drug trafficking for a period of years. This fact also distinguishes the defendant from several of his co-defendants who only participated in a dry sting operation and were not involved in long term illegal activity. Moreover, the defendant's conduct is troubling not only because he chose to help drug traffickers, but because he did so from a position of privilege. Thus, he contributed to the structural environment in Honduras where violent drug-trafficking organizations thrived.[2]

The defendant also was untruthful with the Court concerning his drug-trafficking activities. During the defendant's plea allocution, the defendant stated that while he agreed with others to engage in drug-trafficking activities, "the operation never took place, and [he] did not receive any financial benefit from" those activities. (Plea Tr. at 14). However, in paragraph 9 of the PSR, as confirmed in the defendant's sentencing submission, the defendant now admits that on at least one occasion he did accompany Diaz Morales during the transportation of a load of cocaine and that he was paid between $5,000 and $20,000 each time he assisted the organization. The defendant's false statements during his plea allocution plainly qualify as obstruction of justice under the Guidelines. *See* U.S.S.G. § 3C1.1, Application Note 4(C), (F).

A sentence within the Guidelines Range is also necessary to serve the purpose of affording adequate deterrence to criminal conduct. The audacity of the defendant's crime has understandably captured the attention of the public in the United States and Honduras. Thus, the deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any powerful official tempted to engage in conduct similar to the defendant's. This case also illustrates why arresting drug traffickers alone will not suffice to stem the tide of cocaine coming into this country. Drug traffickers will be replaced, but what must be attacked and targeted is the structural support provided to drug traffickers in countries like Honduras that allows drug traffickers to flourish at monumental levels.

---

[2] The Court should disregard the defendant's assertion that he was actually investigating Fernandez Rosa given that he has pled guilty to helping him engage in drug trafficking. *See* Def.'s Submission at 43. Even if the defendant was "investigating" him, that fact may actually be aggravating because the defendant made no effort to bring Fernandez Rosa to justice.

## II. THE DEFENDANT'S SENTENCING ARGUMENTS

The defendant makes principally three arguments in favor of a below-Guidelines sentence: (i) the defendant's medical conditions explain his criminal conduct, (ii) this case has had collateral consequences on the defendant and his family, and (iii) the defendant acted under the color of authority when he engaged in drug-trafficking activities in 2014. These arguments are unpersuasive.[3]

First, the defendant's claim that his medical conditions had the effect of "skewing" his decisions is a red herring. *See* Def.'s Sub. at 10-17. In this respect, the defendant has introduced a report of a doctor who examined the defendant on one occasion and determined that he suffers from post traumatic stress disorder ("PTSD"). Even assuming this diagnosis is correct, the defendant makes no effort to explain how PTSD—a disorder in which a person cannot control their response to a triggering event—has any bearing on why he decided for years to assist large scale drug traffickers.

Second, it is true that, as a result of the defendant's crime, he has been separated from his family and has lost some assets in Honduras. *See* Def.'s Sub. at 34-37. But those foreseeable consequences are not a mitigating feature of this sentencing. Moreover, the financial losses suffered by the defendant's family were caused principally by actions of the Honduran Government, as opposed to steps taken by the prosecution here or punitive actions related to the defendant's violation of U.S. criminal law. The defendant was a respected member of the Honduran National Police, who was more than capable of supporting his loved ones through a legitimate livelihood. Instead, he made the choices that resulted in him being separated from his family and losing some of his wealth.

Finally, the defendant's alleged claim of public authority is meritless. *See* Def.'s Sub. at 18-24. As an initial matter, the defendant is incorrect that the Government credited that the defendant's participation in the meeting with the Sources was lawful or authorized. *See* Def.'s Sub. at 25. The Government has not made such a representation to the defendant or anyone else; nor has the Government immunized the defendant for this conduct. Rather, the Government decided to accept a guilty plea from the defendant to drug trafficking conduct that predates the meeting with the Sources. Accepting such a guilty plea is not an acknowledgment that the defendant's conduct in connection with the Sources was lawful. In fact, in the absence of the defendant's guilty plea, the Government was prepared to move forward on those charges.

Nevertheless, the Government has interviewed Osguera Mass and Cerrato-Cruz regarding the defendant's claims of public authority. *See* Exhibits B and C, respectively. It is clear from those interviews that while the defendant may have reported that he wanted to participate in the meeting with the Sources in an undercover capacity in 2014, he did virtually nothing that an honest law enforcement officer should do before, during, or after that meeting. As Osguera Mass explained, the defendant "did not report on subsequent actions" after the meeting; "never

---

[3] In the defendant's submission, he also describes his conduct as a law enforcement officer prior to engaging in criminal activity. Def.'s Sub. at 2-4. The Government does not dispute that his lawful conduct as a public servant is a mitigating factor at sentencing.

submitted a written report stemming from the undercover meeting"; and "only talked about Avila-Meza and the [Sources] being involved in the proposed meeting. [He] did not mention the other co-conspirators." In fact, Osguera Mass only learned about the "undercover meeting" from the Honduran news media. Similarly, Cerrato-Cruz stated that he instructed the defendant to document everything regarding the meeting and provide it to Honduran prosecutors for review. However, the defendant "did not report on subsequent actions," and he "did not brief Cerrato-Cruz on any meetings nor did [he] document a written report from the meeting."

The defendant did none of the things that a law enforcement officer would do if he or she were actually investigating the proposed drug transaction, such as reporting his co-defendants so that they could be disciplined, fired, and/or prosecuted. Instead, the defendant simply participated in the meetings with the Sources so he could benefit from the bribes if they were paid—like he did for years with Fernandez Rosa—but deny responsibility by recourse to a conversation with a "friend" in the police department. These are not the actions of an honorable, law-abiding public servant; they are the actions of an individual who decided that criminality was more lucrative than enforcing the law.

* * *

In sum, the defendant's criminal conduct was not aberrational. He participated in a years-long drug trafficking operation with one of one of the largest drug-trafficking organizations in Honduras. The defendant has not been unfairly punished for his conduct. He was a law enforcement officer who acted with impunity to enrich himself and to support drug traffickers all to the detriment of his fellow citizens and the conditions in Honduras and the United States. Based on his offense and his characteristics, a Guidelines sentence is necessary to provide just punishment, to promote respect for the law, and to afford adequate deterrence—particularly general deterrence with respect to individuals like the defendant who seek to use their power to facilitate the activities of drug-trafficking organizations in their countries.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines Range is appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Emil J. Bove III
Matthew Laroche
Assistant United States Attorneys
(212) 637-2420

cc:   Defense Counsel (by ECF)